In
The

                                                Court
of Appeals

                        Sixth
Appellate District of Texas at Texarkana

 

                                                ______________________________

 

                                                             No. 06-09-00086-CR

                                                ______________________________

 

 

                             BRANDON DALE WOODRUFF,
Appellant

 

                                                                V.

 

                                     THE STATE OF TEXAS, Appellee

 

 

                                                                                                  


 

 

                                       On Appeal from the 354th
Judicial District Court

                                                              Hunt County, Texas

                                                            Trial
Court No. 23,319

 

                                                          
                                        

 

 

 

                                          Before Morriss, C.J.,
Carter and Moseley, JJ.

                                                          Opinion by Justice Carter








                                                                   O P I N I O N

 

            Dennis
and Norma Woodruff, parents of Brandon Dale Woodruff, were murdered in their
manufactured home in Royse City, Texas, on October 16, 2005.  Both Dennis and Norma died as a result of
gunshot wounds and multiple stab wounds.  Brandon was soon arrested for their
murders.  While Brandon was in jail
awaiting trial, the Hunt County District Attorney’s Office instructed the Hunt
County Sheriff’s Office to record Brandon’s conversations with his attorneys
and provide the district attorney’s office with copies of the recordings.  The Texas Attorney General’s Office agreed to
prosecute the case after the Hunt County District Attorney’s Office
recused.  Prior to trial, Brandon filed a
motion to suppress a statement he had given to the police, which the trial
court denied.  A jury found Brandon
guilty of capital murder, and an automatic life sentence was assessed.  

            Brandon
raises five issues on appeal.  He argues
that the evidence is legally and factually insufficient, that the trial court
erred in denying his motion to dismiss, that the trial court erred in refusing
to permit questioning of a Hunt County assistant district attorney, and that
the trial court erred in denying the motion to suppress Brandon’s
statement.  Because the evidence is
sufficient and the trial court did not err in refusing to dismiss the
indictment, refusing to permit the questioning of the Hunt County assistant
district attorney, or denying Brandon’s
motion to suppress, we affirm. 

I.          The
Evidence Is Sufficient under Jackson v.
Virginia

            In his brief, Brandon argues the
evidence is legally and factually insufficient.[1] The State was obligated to prove, beyond a
reasonable doubt, Brandon intentionally or knowingly caused the death of Norma
and Dennis during the same criminal transaction.  Tex.
Penal Code Ann. §§ 19.02, 19.03(a)(7)(A) (Vernon 2003 & Supp.
2010).  In reviewing the evidence for
sufficiency, we consider the evidence in the light most favorable to the
verdict to determine whether any rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307,
318–19 (1979).  In the Brooks
plurality opinion, the Texas Court of Criminal Appeals found “no meaningful
distinction between the Jackson v. Virginia legal-sufficiency standard
and the Clewis[2]
factual-sufficiency standard, and these two standards have become
indistinguishable.”  Brooks, 2010
WL 3894613, at *8.  In a concurring
opinion, Judge Cochran pointed out that the United States Supreme Court has
rejected a legal sufficiency test that requires a finding that “no evidence”
supports the verdict because it affords inadequate protection against potential
misapplication of the “reasonable doubt” standard in criminal cases.  Id. at *16 (Cochran, J.,
concurring).  Rather than meeting a mere “no
evidence” test, legal sufficiency is judged not by the quantity of evidence,
but by the quality of the evidence and the level of certainty it engenders in
the fact-finder’s mind.  Id. at
*17.  Sufficiency of the evidence claims
are measured by the elements of the offense as defined by a hypothetically
correct jury charge.  Malik v. State,
953 S.W.2d 234, 240 (Tex. Crim. App. 1997).

            A.        The Circumstantial Evidence of Guilt

                        1.         The Crime Scene

            Charla
Woodruff, Brandon’s sister, attempted to contact Dennis and Norma by telephone
when she reached her college apartment at 11:00 p.m. on the night of the
murders.[3]  Several other family members, including
Brandon, attempted to contact Dennis and Norma. 
The following day, the police were requested to conduct a welfare check.  Although no one responded to the police
officers, the police did not force entry into the residence.  At the request of Linda Matthews, Brandon’s aunt,
Todd Williams forced entry into the residence and discovered the deceased.  

            The
crime scene indicated Dennis and Norma were killed without a significant
struggle. They were sitting next to each other on their living room couch,
covered in blood, and obviously dead. 
Dennis’ spit cup was still in his hand.  Norma was found seated facing her husband, and
the police theorized that Norma may have been attempting to duck behind her
husband.  The crime scene investigation
did not reveal any signs of forced entry, any signs of a struggle, or any signs
the house had been ransacked. 
Investigator Tommy Grandfield testified he did not believe the position
of the bodies was suggestive that the victims had been taken by surprise.  The wallets of Dennis and Norma were missing,
but many valuables, including a handgun, a computer, jewelry, and appliances
remained.  

            The
police noted blood droplets in front of the couch and a trail of blood droplets
leading from the couch toward the guest bathroom and bedroom.  Neal Martin, a crime scene investigator with
the nearby Smith County Sheriff’s Office, testified the blood droplets in front
of the couch and the trail of blood droplets were the result of “‘passive blood
flow’ or simply free-falling blood.” 
There were hairs in the bathtub of the guest bathroom that were very
dark with light roots.[4]  The scene also contained blood stains on
mini-blinds behind the couch, which were most likely caused by a high-velocity
impact, such as a gunshot wound.  No
shells were discovered at the scene, which suggested the murderer either used a
revolver or had picked up the casings before he left.  Due to the soot and stippling, Dr. Sheila Spotswood,
the pathologist who performed Norma’s autopsy, testified the murderer
discharged the firearm at less than twelve inches from Norma.  

            During
the autopsy, large caliber bullets were removed from Norma’s neck and from
Dennis’ cervical vertebrae.  Norma died
from five gunshot wounds[5]
and a four-inch-deep stab wound across her neck.  Dennis died from a gunshot wound to the face
and nine stab wounds to his face, neck, and chest.  

                        2.         Brandon’s Dagger Was Found with His Dad’s
Blood on It

            Brandon
had been attending Abilene Christian University and had kept a dagger in his
dormitory room.[6]  When the room was searched after the murders,
the police did not discover the dagger. 
Kathy Lach, Brandon’s aunt, discovered the dagger in the barn at Dennis
and Norma’s residence in Heath, Texas,[7] two
and a half years after the murders.  The
dagger was approximately sixteen to eighteen inches long with a twelve-inch
blade.  Eric Gentry admitted he had
previously told the Texas Rangers that the knife blade of Brandon’s dagger was
only about six inches long, but testified he was absolutely certain the dagger
introduced into evidence was Brandon’s. 
A spot of Dennis’ blood was discovered under a skull located on the
guard of the knife.  

            Although
the police searched the barn after the murders, they did not find the
dagger.  Approximately ten days after the
murders, the police, with the consent of Charla, searched the Heath house.  Grandfield testified that they “looked
everywhere,” including underneath the house. 
Charla testified the barn at the Heath house contained items which were
moved from a prior residence and never unpacked, as well as items that had
piled up over the years.  Investigator
Joel Gibson conceded that the dagger could have been placed in the barn by
someone other than Brandon.  The barn was
not locked until years after the murders. 
After the murders, but before the discovery of the dagger, the barn had
been cleaned out and items from the Heath house were stored in it.  

            The
State’s expert was unable to testify the dagger was the murder weapon, but
testified the dagger “would be consistent with all the wounds.”  The State’s expert admitted the wounds might
have been caused by a kitchen knife.    

            Dr.
Joy Carter, former chief medical examiner for Washington, D.C., and for Harris
County, Texas, testified for the defense and criticized the autopsy.  Carter testified, among other complaints,
that the examiners failed to compress the wounds to determine whether the edges
were consistent with a blunt-edged knife or a sharp-edged knife.  Carter testified the majority of stab wounds
are committed with a knife with one blunt edge and one sharp edge, rather than
a knife with two sharp edges.  Carter
opined, after examining the autopsy files, that the wounds in this case were
caused by a knife with one blunt edge and one sharp edge.  She also opined that two knives were used
because some of the wounds were rectangular. 
Carter believed some of the wounds had abrasions which indicated the
knife was driven into the body until the knife guard made contact with the
skin.  The deepest stab wound was five
and three-fourths of an inch deep.  Thus,
Brandon’s dagger, which had a twelve-inch blade, could not have been driven
into the wound to the guard.  Because
Brandon’s dagger had two sharp edges and a twelve-inch blade, much longer than
the deepest wound, Carter testified Brandon’s dagger was not the murder
weapon.  

            While
Carter’s testimony is strong evidence contrary to the jury’s verdict, it is the
jury’s duty to weigh the testimony and resolve conflicting testimony; a
rational person could have rejected Carter’s testimony.  Carter only examined pictures of the deceased
and the proper tests were not performed to determine if the murder weapon had a
single blade or a double blade.  

                        3.         Activities on the Night of the Murders

            On
the night of the murders, Brandon left the Royse City house, proceeded to the
Heath house, and then picked up Robert Martinez at a Denny’s in North Dallas.[8]  After picking up Martinez, Brandon went to
the house of Alex Rulli, his boyfriend, and ultimately to a gay club in Dallas,
Texas.  Martinez testified that Brandon
was originally supposed to pick him up at Martinez’s girlfriend’s residence in
Denton around six o’clock.  Martinez
called Brandon multiple times on the night of the murders.  During one of these conversations, Brandon
was breathing heavily.  Eventually,
Martinez’s girlfriend drove Martinez to a Denny’s restaurant in north Dallas,
where Brandon eventually met them, claiming he had gotten lost.  Brandon showed up to meet Martinez without a
shirt or shoes.  Martinez testified he
had never seen Brandon without a shirt or shoes.[9]  When Brandon met up with Martinez, he asked
Martinez if he would mind going to a gay club with him.  Although they had planned to return to
Abilene, Martinez agreed.  On the way
home from the club, Brandon got angry at his friends for going through his
clothes bag.[10]  Rulli and James Britt attributed this
behavior to a desire to keep details about Brandon’s gay life from Martinez. 

                        4.         Brandon’s Lies and Suspicious Behaviors

            The
State presented evidence that Brandon had lied several times.  It is argued that these lies were evidence of
guilt.  A summary of the most persuasive
lies follows.

            The
State proved Brandon lied about the times he did certain activities on the
night of the murders and lied about his parents purchasing him a new
truck.  Brandon truthfully told the
police where he was on the night of the murders, but he lied about the hour.  In an interview with Television News 11,
Brandon repeated the time of day he took certain actions.[11]  In the News 11 interview, Brandon clearly
asserted he left the Royse City house before dark.  Ranger Jeffery Collins, though, admitted the
other teenagers he questioned in this case were also incorrect about the
correct hour of activities.  Collins also
conceded that Brandon was truthful about a number of things.  

            On
several occasions prior to the murders, Brandon had told several friends at ACU
that his parents were going to give him a newer truck and that he would be
bringing the truck back with him.  When
he failed to return with a newer truck on previous trips, Brandon explained his
dad did not want him to have the truck at ACU. 
Brandon returned to ACU on the morning after the murders with Norma’s
truck.  When asked about the truck,
Brandon responded that his dad did not want him to have it, “but that he
brought it back with him anyway.”[12]  

            Matthews
testified Brandon had told her after learning of his parents’ deaths that he
had never fired a gun.  Michelle Lee
testified Brandon had fired a shotgun while he was at her house, but it was
apparent that Brandon was not comfortable with guns.  

            Several
witnesses testified Brandon had given them the impression that his family was
wealthy.  This perception was aided by
Brandon’s lavish spending habits. 
Brandon had told a couple of friends that his parents were moving to a
bigger home[13]
in Royse City, Texas.  In fact, Dennis
and Norma had close to $300,000.00 of debt and were moving into a double-wide
manufactured home to cut down on expenses.[14]  

            The
State also presented some evidence Brandon behaved suspiciously.  Gentry testified Brandon speculated the death
of his parents was not an accident before they learned the details of his
parents’ deaths.  Pam Hoffman, the
hairdresser who dyed Brandon’s hair before the funeral, testified Brandon
talked about his modeling activities and money the entire time he was getting
his hair dyed.  Hoffman also testified
that Brandon claimed to have his dad’s credit card and was planning on going
shopping after they finished.[15]  At the time of the arrest, Brandon had his
parents’ debit card on him.  The fact
that Brandon had his parents’ debit card, while not ordinarily suspicious for a
teenager to have his parents’ debit card,[16] is
suspicious due to the family tensions regarding spending habits.  

                        5.         The Jailhouse Informant

            William
Pardun, an inmate at the jail where Brandon was held pending trial, testified
Brandon had asked how long a gun with a wooden handle would stay submerged and
if it would float.  Pardun, who had
pending DWI charges, denied receiving anything in exchange for his testimony.  On cross-examination, Pardun admitted he was
angry at Brandon because he believed Brandon “kited me up” and got Pardun
removed from the “medical tank.”  Pardun
also admitted he was currently on five years’ community supervision for felony
possession of a controlled substance in Rockwall County, despite an extensive
criminal history, including four prior felony convictions.  

            B.        Opportunity––Access to a Missing Gun

            Shortly after the murders, the
parents of Morgan Lee, Brandon’s girlfriend, noticed an old Western-style
revolver was missing from their home. 
Bullets had been removed from the holster loops, and several of the
holster bullet loops had been torn. 
Michelle Lee, Morgan’s mother, and Morgan both admitted they could not
be certain how long the gun had been missing. 
The evidence showed that Brandon could have stolen the gun while taking
a shower at Morgan’s residence the day before the murders.[17]  The evidence suggests that the missing gun
might have been the murder weapon and that Brandon might have stolen it.  

            The
State introduced evidence which created a strong suspicion that the missing gun
was the murder weapon.  The gun used in
the murders was never recovered. 
Ballistics testing could not determine if more than one gun had been
used.  Dennis and Norma were killed by
large caliber bullets.  The missing gun
was a .45 caliber revolver, and a .45 caliber bullet would qualify as a large
caliber bullet.  Charles Clow testified
the bullets removed from Norma and Dennis were cast lead bullets,[18]
which are normally used in reloading bullets by hand and are called “cowboy
loads.”  Mike Lee, Morgan’s father,
informed Ranger Collins that he had loaded the ammunition for the missing gun.  The State, though, has not directed this Court
to where there is evidence that Mike used cast lead bullets.  The State’s expert testified the bullets were
fired from a gun with six lands and a right twist configuration, which is used by
at least two manufacturers—Yeager and Ruger. 
The State, though, has not directed this Court to where there is
evidence in the record concerning what company manufactured the missing gun. 

            Robert
Fazio, the defense’s ballistics expert, criticized the State’s expert for not
measuring the bullets removed from the deceased.  Fazio testified six land and groove
impressions with a right twist is a common characteristic that is used by many
manufacturers.  On cross-examination, Fazio
admitted the bullets recovered from the deceased have the same characteristics
as the bullets provided by the Lees and could not name any additional manufacturers
of guns with six land and groove impressions with a right twist.

C.        The
Evidence Establishes Brandon Had Sufficient Time to Commit the Murders

 

            The
defense claims Brandon had at the most twenty minutes to kill his parents.  The State argues Brandon had sufficient time
to commit the murders.  Dennis and Norma
were alive around nine o’clock when they talked on the telephone with Opal
Johnston, Brandon’s grandmother. 
Johnston testified it was not a long conversation.  Brandon was placed at the Heath house by a
neighbor sometime between 10:15 p.m. and 10:45 p.m.[19]  Cell phone records indicate Brandon had
passed Lake Ray Hubbard and was proceeding into Dallas by 10:45 p.m.[20]  The State introduced evidence that the
driving time from Royse City to the Heath house was approximately twenty-three
minutes.[21]  

            The
defense argues that Brandon would not have killed his parents until after 9:35
p.m. because he called Morgan at 9:32 p.m. 
This call went to Morgan’s voicemail. 
Morgan then called Brandon at 9:41 p.m., and the call lasted three
minutes.  Brandon made or received
twenty-five calls between 8:50 p.m. and 11:22 p.m.  Although nine calls were made to Brandon’s
cell phone between 9:32 p.m. and 10:34 p.m., Brandon did not make any calls
during this time period.  The State
alleges these calls went to voicemail and argues Brandon was too busy
committing murder to answer his cell phone. 
Only one call[22]
had the voicemail code, but John Minor, the defense’s communication expert,
testified the lack of the code does not necessarily mean the call did not go to
voicemail.  Minor testified the only way
to be absolutely sure the call went to voicemail is when the code is
present.  Although Minor testified there
is no reason to disbelieve the calls went to voicemail, he testified there is
no evidence to support that the calls did go to voicemail.  None of the calls Martinez placed to Brandon’s
cell phone have the voicemail code.  At
trial, the defense argued Brandon would not have taken time out to talk to
Morgan while in the middle of murdering his parents.  A rational juror could have concluded Brandon
had sufficient time to murder his parents.

            D.        Allegations of Motive 

                        1.         Brandon Had Just Told His Parents He
Was Gay

            Brandon
informed his parents he was attracted to other men on the weekend the murders
occurred.  The State argues this provides
a motive for their murders.  Lach
testified that Dennis was disappointed due to the risk of AIDS in a homosexual
lifestyle.  Lach testified Dennis was “very
sad and hurt.”  There is no evidence,
though, that Norma and Dennis, while disappointed, threatened to disown
Brandon.  Todd Williams testified Brandon
had always been respectful to his parents. 
Grace Jackson testified Brandon always had a good relationship with his
mother.[23]   

                        2.         Brandon Was Flunking Out of School

            Brandon
had been conditionally admitted to ACU on academic probation.[24]  Brandon had been dropped from several classes
for failing to attend classes.  Brandon’s
parents had informed him they would not pay for any additional college expenses
if he failed to prove himself in his first semester.  Matthews testified she presumed he would have
to move back in with Dennis and Norma if he flunked out of school.  In the news interview, Brandon stated he did not
sleep at the Royse City house because he did not “like that kind of atmosphere.”[25]  

                        3.         Brandon Had Credit Card Debt

            Several
witnesses testified Brandon’s spending habits created tension between him and
his father.  Brandon had maxed out two
credit cards.  Brandon and Dennis had a
fight when Brandon spent a college tuition refund that belonged to Dennis.  At the time of the arrest, Brandon had his
parents’ debit card on him.  

            The
defense presented contrary evidence that Brandon’s finances were not out of
control.  Ranger Collins conceded it is
not unusual for college students to run up credit card debt.  Jackson testified Brandon had been receiving
payments on a horse he had sold.  Gentry
testified Brandon received $15,000.00 for a horse that died and several thousand
dollars for “modeling.”  Further, the
amounts of Brandon’s credit cards, while considerable for the time he had the
cards, only totaled approximately $3,810.04.[26]  Further, Dennis and Norma had $300,000.00 in
credit card debt.  The defense argued
Brandon’s credit card debt may have been learned from his parents’ behavior and
was not much evidence of a motive.

                        4.         Brandon Wanted His Mother’s Truck

            The State argues Brandon’s desire
for Norma’s truck and the fact that Brandon had Norma’s truck in Abilene establishes
a motive for the murders.  Brandon
claimed to have had Norma’s truck because his truck had broken down.  When examined by the police, Brandon’s truck
did not appear to have any mechanical problems.  Charla testified that Brandon had been permitted
to drive the truck for prom, but not for anything else.  Charla opined her mother would not have let
Brandon drive the truck to Abilene. 
Charla testified she had driven Norma’s truck on only one occasion.  On cross-examination, Charla admitted she had
told the Texas Rangers that Brandon had been permitted to drive Norma’s truck
to haul stock trailers.  A number of
witnesses testified Norma was very protective of her truck.  

            The
defense, however, presented a number of witnesses who testified Brandon would
drive Norma’s truck on occasion.  Randy
Lunz, Dennis and Norma’s neighbor at the Heath house, testified Brandon drove
Norma’s truck one time when his truck had broken down.  Michelle Lee testified Brandon was allowed to
drive the truck and had done so on multiple occasions for the FFA.  Other than the FFA, Michelle admitted the
only other occasion she had seen Brandon driving the truck was for prom.  Keel and Jackson testified they had both
observed Brandon driving Norma’s truck during the summer before he started
college.  Deann Glover testified she had
seen Brandon driving Norma’s truck at least twice when he came in for
feed.  Charla testified Brandon would
frequently ask to borrow the truck and would frequently pester his mother until
he got his way.  

                        5.         Life Insurance

            Although
the State did not emphasize life insurance as a motive, the evidence at trial
indicated Dennis and Norma had life insurance policies.  Charla testified she purchased a manufactured
house, “a tractor, fixed up the land, [and] a four-wheeler” with her part of
the proceeds from Dennis’ and Norma’s life insurance.  The evidence showed that Brandon’s part of
the life insurance proceeds were being held pending the outcome of the murder
trial.  Neither party has directed this Court
to where in the record there is evidence concerning the amount of the life
insurance policies. 

            E.        Defense Argument 

                        1.         Investigation
Deficiencies

            The
defense emphasizes a number of deficiencies in investigating the crime.  The State failed to fingerprint many items in
the Royse City house, failed to perform DNA testing of the blood stains on the
carpet and bathroom sink, and failed to perform DNA testing on the hairs found
in Norma’s hand.[27]  Many items were seized, but not logged and
stored in an office.  These deficiencies,
though, are not sufficient to prevent a rational juror from concluding, beyond
a reasonable doubt, that Brandon committed the murders.

                        2.         The
Defense Suspect:  Mike Etherington

            The
defense introduced evidence suggesting Mike Etherington may have committed the
murders.  Etherington attempted to
bolster the State’s evidence. 
Etherington lied to the police about whether he had personally seen
inculpatory statements on Brandon’s MySpace page.  Michelle reported the missing gun and took
the holster to the Sheriff’s Department at the urging of the father of a friend
of Etherington.  

            Etherington
committed a number of suspicious acts.  A
number of witnesses testified Etherington and Brandon were in conflict.  Gentry testified Brandon and Etherington were
not getting along.  Williams testified Norma
suspected Etherington of poisoning Brandon’s dog.  After the bodies were found, Etherington made
a number of calls to the Royse City house and used *67 to prevent his name from
appearing on the caller ID.  The bodies
were discovered on the evening of October 18. 
The first attempt to call the Royse City house was on October 19 at
12:20 a.m.  Michelle testified that
Etherington had been to the Lees’ house a few days prior to the murders as
well.  Therefore, Etherington could have
stolen the gun.  Etherington’s phone
records indicate he was approximately five miles from the Royse City house on
the night of the murders.  The record,
though, does not establish where Etherington lives or where he was on the night
of the murders.  There is no evidence,
beyond mere surmise, that Etherington had anything to do with the murders.  

            F.         The Evidence Is Legally Sufficient

            Portions
of the State’s arguments are either marginally relevant or highly probative of
Brandon’s guilt.  The State’s evidence
merely suggests the missing gun may have been the murder weapon and Brandon may
have stolen it.  While the evidence
clearly establishes the dagger belonged to Brandon and had Dennis’ blood on it,
the record contains conflicting evidence concerning whether the dagger was the
murder weapon.  We also note a number of
the State’s witnesses have credibility issues. 


            The
plurality opinion in Brooks suggests “the
‘confusing’ factual-sufficiency standard may have skewed a rigorous application
of the Jackson v. Virginia standard
by the court of appeals.”  Brooks, 2010 WL 3894613, at *14 (Hervey,
J., lead op.).  The United States Supreme
Court has made it abundantly clear that no weighing of the evidence is
permitted under the Jackson v. Virginia standard.  See
Tibbs v. Florida, 457 U.S. 31, 47 (1982) (discussing difference between
legal and factual sufficiency and holding Double Jeopardy Clause does not bar
retrial when a case is reversed for factual sufficiency).  The United States Supreme Court distinguished
a reversal based on an “independent assessment of evidentiary weight” from the Jackson v. Virginia standard and stated,
under Jackson v. Virginia, “[t]he
trier of fact, not the appellate court, holds ‘the responsibility . . . fairly
to resolve conflicts in the testimony, to weigh the evidence, and to draw
reasonable inferences from basic facts to ultimate facts.’”  Id.
at 45 nn.21 & 22 (quoting Jackson,
443 U.S. at 319).  The only weighing of
the evidence permitted under Jackson v.
Virginia is when no rational juror could find a witness credible.[28]
 While a number of the State’s witnesses
have credibility issues, the credibility concerns are not so strong that a
rational juror could not have found their testimony credible.  

            The
question presented is whether the evidence is so weak that a rational juror
could not have found Brandon guilty beyond a reasonable doubt.  Viewed in a light most favorable to the
prosecution, there is evidence from which a rational juror could conclude,
beyond a reasonable doubt, that Brandon committed the murders.  The State established that Brandon had the
opportunity to commit the crime.  Brandon
had sufficient time to commit the murders and could have stolen the missing
gun.  A dagger with Dennis’ blood on it
was identified as belonging to Brandon. 
Brandon lied about the times of his activities and behaved
suspiciously.  A rational juror could
have found Brandon guilty beyond a reasonable doubt.  The evidence is legally sufficient.

II.        The Trial Court Did Not
Err in Refusing to Dismiss the Indictment

            In
his third point of error, Brandon argues the trial court erred in not
dismissing the indictment due to the State’s recording of privileged
attorney-client telephone calls.  While
Brandon was in jail awaiting trial, the Hunt County District Attorney’s Office
instructed the Hunt County Sheriff’s Office to record Brandon’s telephone
conversations with his attorneys and provide the district attorney’s office
with copies of the recordings.  Curtis
Neel, the chief jailer for the Hunt County Sheriff’s Department, testified that
it is the jail’s practice to record all inmate telephone calls and that he
provided copies of Brandon’s telephone calls to the Hunt County District
Attorney’s Office at its request.  

            When
the defense filed a motion to dismiss due to the recordings, the Hunt County
District Attorney’s Office initially resisted recusal.  Judge Richard Beacom, judge of the 354th Judicial
District Court,[29]
ruled the Hunt County District Attorney’s Office violated the Sixth Amendment
right to counsel and ordered any evidence obtained as a result of the
recordings be suppressed.  The trial
court, though, concluded the indictment should not be dismissed and the Hunt
County District Attorney’s Office was not disqualified.  

            The
State does not challenge the trial court’s conclusion that Brandon’s Sixth
Amendment right to counsel was violated. 
A defendant has a right to reasonably effective assistance of counsel at
all critical stages of the criminal proceedings under the Sixth Amendment and
the Due Process Clause of the Fourteenth Amendment.  U.S.
Const. amend. VI, XIV; Gideon v.
Wainwright, 372 U.S. 335 (1963); see
Strickland v. Washington, 466 U.S. 668, 686–92 (1984).  While not absolute,[30] a
criminal defendant has the right to communicate and consult in private with his
or her attorney.  The Third Circuit Court
of Appeals has described the Sixth Amendment right to counsel as follows:

The fundamental justification for the sixth
amendment right to counsel is the presumed inability of a defendant to make
informed choices about the preparation and conduct of his defense.  Free two-way communication between client and
attorney is essential if the professional assistance guaranteed by the sixth
amendment is to be meaningful.  The
purpose of the attorney-client privilege is inextricably linked to the very
integrity and accuracy of the fact finding process itself.  Even guilty individuals are entitled to be
advised of strategies for their defense. In order for the adversary system to
function properly, any advice received as a result of a defendant’s disclosure
to counsel must be insulated from the government. 

 

United States v. Levy, 577 F.2d 200, 209 (3d Cir. 1978).  “If a state agent interferes with
confidential attorney-client communications, not only is there a risk of
disclosure of confidential information but also such an intrusion chills free
discussion between a defendant and his attorney.”  State
v. Pecard, 998 P.2d 453, 459 (Ariz. Ct. App. 1999).  It is beyond dispute that the actions of the
Hunt County District Attorney’s Office constituted a violation of the Sixth
Amendment right to counsel.  However, the
existence of an infringement on this right does not always justify the extreme
remedy of dismissal.  

            Both
the United States Supreme Court and the Texas Court of Criminal Appeals have
noted that dismissal may be the appropriate remedy for certain violations of
the Sixth Amendment right to counsel.  United States v. Morrison, 449 U.S. 361,
365–66 (1981); State v. Frye, 897
S.W.2d 324, 330 (Tex. Crim. App. 1995). 
However, both courts have also cautioned that dismissal is appropriate
only when the suppression of evidence is insufficient to purge the taint of the
violation.  The United States Supreme
Court has stated, “absent demonstrable prejudice, or substantial threat thereof,
dismissal of the indictment is plainly inappropriate.”[31]  Morrison,
449 U.S. at 365.  The Texas Court of
Criminal Appeals has held:

When confronted with a Sixth Amendment violation,
a trial court must, “identify and then neutralize the taint by tailoring relief
appropriate in the circumstances to assure the defendant effective assistance
of counsel and a fair trial.”  Morrison, 449 U.S. at 365 . . . .  The Supreme Court stated that suppressing
evidence and limiting cross-examination are the preferred methods for
neutralizing the effects of right to counsel violations.

 

Frye, 897 S.W.2d at 330 (quoting Morrison, 449 U.S. at 365). 
Dismissal of an indictment is “a drastic measure only to be used in the
most extraordinary circumstances.”  Id.; see
State v. Mungia, 119 S.W.3d 814, 817
(Tex. Crim. App. 2003) (trial court erred in dismissing indictment without
constitutional violation).

            In
our review of the record, we have reviewed the telephone calls recorded by the
Hunt County Sheriff’s Office at the request of the Hunt County District
Attorney’s Office.[32]  Approximately 165 telephone calls were
recorded, including both privileged and nonprivileged calls.  Approximately fifty-four of the calls were
made to Brandon’s defense counsel or his office staff.  The following is a summary of the recorded
privileged telephone calls.  Most of the
calls discuss irrelevant information such as relatives providing Brandon with
money, clothes Brandon is going to wear for court appearances, other inmates,
and lockdowns.  A number of calls contain
discussions about where witnesses live and attempts to track down the telephone
numbers of witnesses.  On Exhibit 1B, the
defense counsel’s secretary and Brandon discuss how Etherington lied in his
statement to the police.  On Exhibit 1E,
track 5, the defense counsel’s secretary and Brandon mention they can prove why
he did not have shoes on the night of the murder without providing any
details.  On Exhibit 1L, track 6, Brandon
and the attorney’s secretary discuss that one of the profilers used to date his
sister.  On Exhibit 1M, track 5, they
talk about Mike Lee.  On Exhibit 1P,
track 1, the attorney’s secretary asks Brandon what truck he drove to the Heath
house and Brandon informs her he drove his truck to the Heath house and then
drove Norma’s truck to Abilene.   Our
review failed to discover any privileged information of even the most marginal
value to the State.  Although not for
lack of trying, the Hunt County District Attorney’s Office failed to discover
anything of value when it violated Brandon’s constitutional rights.

            The Texas Court of
Criminal Appeals has held that it is the defendant’s burden to show prejudice
or a substantial threat thereof.  Murphy v. State, 112 S.W.3d 592, 603
(Tex. Crim. App. 2003) (noting split among federal courts concerning whether
there is rebuttable presumption of prejudice). 
Brandon has failed to provide this Court with any demonstrable
prejudice.  Brandon argues a substantial
threat of prejudice has been demonstrated because the State gained insights
into the defense’s thought processes. 
Prejudice can be demonstrated either when the State obtains information
which leads to admissible evidence against the accused or obtains any information
that would only give the State a tactical advantage.  See
Weatherford v. Bursey, 429 U.S. 545, 558 (1977); Mastrian v. McManus, 554 F.2d 813, 821 (8th Cir. 1977); Graddick v. State, 408 So.2d 533, 546
(Ala. Crim. App. 1981) (“The dangers of subtle use by the prosecutor of the
information from the conversation either evidentially or strategically, are
obvious.”).  

            In
this case, it is clear that some information was elicited.  The State’s attorney who reviewed the tapes
took forty-three pages of notes.[33]  Ranger Collins admitted that he reviewed
eight or ten telephone calls and that at least one of them would have been
covered by the attorney-client privilege. 
Collins admitted he conducted “[s]ignificant investigations” in this
case and was still working on the case when he reviewed the telephone calls.  Collins, though, testified his notes “were of
no value to me.”  The record, though,
does not contain evidence that the prosecutor or the police obtained any useful
information.[34]  

            It
was apparent that the defense attorneys suspected that the telephone calls were
being recorded.  The defense attorney’s
office frequently reminded Brandon the telephone calls might be recorded and on
a few occasions declined to discuss certain topics with Brandon over the telephone.  In fact, on Exhibit 1F, track 5, the defense
attorney informs Brandon that the district attorney’s office has recorded attorney-client
telephone calls in another case.  On
Exhibit 1L, track 5, the defense counsel’s secretary mentions that she has been
listening to the recordings.  Certain
matters were referred to by references so vague that the references could not
be deciphered.  

            Although
the recording of the telephone calls might have chilled effective communication
over the telephone, the record does not indicate Brandon could not effectively
communicate with his counsel through other means.  The recorded conversations do not reveal
anything that would be useful to the State. 
While there may be a theoretical threat of prejudice, there is not a substantial
threat of prejudice.  Because Brandon has
failed to show demonstrable prejudice or a substantial threat thereof, the
trial court did not err in refusing to dismiss the case.  See
Arroyo v. State, 259 S.W.3d 831, 834
(Tex. App.––Tyler 2008, pet. ref’d) (dismissal not required where no
information was elicited from defendant). 


III.       The Trial Court Did Not
Err in Denying Examination of Assistant District Attorney  In his fourth point of error, Brandon argues
the trial court erred in limiting his questioning of the assistant district attorney
who reviewed the recordings.  After the
trial court’s ruling on Brandon’s motion to dismiss, the Hunt County District
Attorney’s Office recused itself.  The
Texas Attorney General’s Office agreed to prosecute the case.  The trial court issued an order appointing an
Assistant Texas Attorney General as special prosecutor and, in that order,
instructed the Texas Attorney General’s Office to “have no contact with the
Hunt County District Attorney concerning this case until further order of the
Court.”  The trial court requested a
visiting judge be appointed to “ensure any suppressed evidence is not
transmitted from the District Attorney to the Attorney General.”[35]


            Judge
Webb Biard was appointed by the administrative judge for the First
Administrative Judicial Region.  The
defense filed a motion to require the Hunt County District Attorney’s Office to
disclose any information learned as a result of the recordings.  During the hearing on the motion, Judge Biard
denied the defense’s request to question the assistant district attorney who
reviewed the recordings.  After a review
of the transcripts of the telephone calls and an in camera review of the Hunt
County District Attorney’s Office’s file, Judge Biard concluded the Hunt County
District Attorney’s Office did not obtain any useful information from the
recordings and denied the defense motion.[36]  

            The
origin of the attorney work-product privilege is more amorphous in criminal
cases than in civil cases.  In civil
cases, it is provided for specifically in the Texas Rules of Civil
Procedure.  The Texas Rules of Evidence,
which apply to both civil and criminal cases explicitly provide for the
attorney-client privilege, but are not as explicit concerning the attorney
work-product privilege.  Rule 503(b)
provides as follows, in pertinent part:

            (b)       Rules
of Privilege.

            (1)        General rule of privilege.  A client has a privilege to refuse to disclose
and to prevent any other person from disclosing confidential communications
made for the purpose of facilitating the rendition of professional legal
services to the client:

            (A)       between the client or a representative of
the client and the client’s lawyer or a representative of the lawyer;

            (B)       between the lawyer and the lawyer’s
representative; 

            (C)       by the client or a representative of the
client, or the client’s lawyer or a representative of the lawyer, to a lawyer
or a representative of a lawyer representing another party in a pending action
and concerning a matter of common interest therein; 

            (D)       between representatives of the client or
between the client and a representative of the client; or

            (E)       among lawyers and their representatives
representing the same client.

            (2)        Special
rule of privilege in criminal cases.  In criminal cases, a client has a privilege to
prevent the lawyer or lawyer’s representative from disclosing any other fact
which came to the knowledge of the lawyer or the lawyer’s representative by
reason of the attorney-client relationship.

            (c)        Who
May Claim the Privilege.  The
privilege may be claimed by the client, the client’s guardian or conservator,
the personal representative of a deceased client, or the successor, trustee, or
similar representative of a corporation, association, or other organization,
whether or not in existence.  The person
who was the lawyer or the lawyer’s representative at the time of the
communication is presumed to have authority to claim the privilege but only on
behalf of the client.

            (d)       Exceptions.
 There is no privilege under this rule:

            (1)        Furtherance
of crime or fraud.  If the services
of the lawyer were sought or obtained to enable or aid anyone to commit or plan
to commit what the client knew or reasonably should have known to be a crime or
fraud; . . . .

 

Tex.
R. Evid. 503.  The Texas Court of
Criminal Appeals has adopted a nonliteral interpretation of Rule 503(b)(2) and
concluded the “attorney’s work-product falls under this special rule of
privilege.”  Cameron v. State, 241 S.W.3d 15, 19 (Tex. Crim. App. 2007); see State ex rel. Curry v. Walker, 873
S.W.2d 379, 381 (Tex. 1994) (noting work-product privilege applies in criminal
cases).

            The
defense claims the trial court erred because the crime-fraud exception applies
in this case and because only core work product is protected.  The State claims the crime-fraud protection
does not apply to the attorney work-product privilege and claims the defense
failed to show a substantial need.  We
will examine each argument in turn.

            A.        The Crime-Fraud Exception Does Not Apply
in this Matter

            The State argues the crime-fraud
exception does not apply because it only applies to the attorney-client
privilege.  The Texas Court of Criminal
Appeals has held Rule 503(b)(2) includes the work-product privilege[37]
and, therefore, we hold the exceptions of subsection (d) also apply to the
work-product privilege in the proper circumstances.  

            Brandon
argues the crime-fraud exception applies because the district attorney
conspired to deprive him of his civil rights, citing 42 U.S.C. § 1983.  This section, however, only provides a civil
cause of action.  Brandon does not argue
any of the provisions of the United States Code or other statutes providing
criminal liability for civil rights violations. 
See, e.g., 42 U.S.C.A. § 1985;
18 U.S.C.A. §§ 241, 242, 245 (West, Westlaw current through 2010).  The crime-fraud exception requires the
attorney’s services to be sought or obtained “to enable or aid commission of
the crime.”  Henderson v. State, 962 S.W.2d 544, 552 (Tex. Crim. App. 1997)
(holding mere furtherance not enough). 
Brandon has failed to show the crime-fraud exception applies to the
facts of this case because he has failed to show the attorney’s services were
sought or obtained to enable or aid in the commission of a crime.

B.        The Distinction Between Core Work Product and Other Work
Product Exists in Criminal Cases

 

            The State argues the defense was
seeking core work product, which is not discoverable.  In civil cases, a distinction is made between
core work product and other work product. 
In Pope v. State, the Texas
Court of Criminal Appeals made the following statements:

            The
scope of the attorney work-product doctrine is sometimes confused with that of
the attorney-client privilege.  The
attorney-client privilege is an evidentiary privilege and protects against the
compelled disclosure of confidential communications.  This privilege belongs to and protects the
client.  The attorney work-product
doctrine, while not a true evidentiary privilege, belongs to and protects the
attorney.  Its purpose is to stimulate
the production of information for trials, and it rewards an attorney’s creative
efforts by giving his work product a qualified privilege from being shared with
others.  It is premised on the notion
that an attorney should not be compelled to disclose the fruits of his labor to
his adversary.  Under Texas civil rules,
material that reflects the attorney’s personal thought processes is “core work
product” and receives absolute protection, while other materials, such as
documents, reports, or memoranda compiled by the attorney or his agents and
communications made in anticipation of litigation or trial are “other work
product” and receive qualified protection.  While the work-product doctrine protects the
communications of parties, attorneys, and agents, the underlying factual
information is not protected.  For
example, descriptions of potential witnesses and statements that would reveal
whether the party had spoken to potential witnesses are not work product and
are discoverable. As Professor Dix has explained:

if defense counsel’s efforts do not create or
enhance the substantive information, that information -- or the form in which
it is preserved -- does not become protected work product. 

That is, facts that are divulged by or exist
independent of the attorney or his agents are not protected, but statements or
documents that set out their thoughts concerning the significance of these
facts or the strategic conclusions that the attorney or his agents draw from
them may well be protected.  Thus,
material prepared by a consulting expert appointed by the trial court to assist
the defense in developing strategies and theories is protected by the
work-product doctrine when that material reflects the expert’s thoughts
regarding the strength and weaknesses of a defense theory.

 

207 S.W.3d 352, 357–58 (Tex.
Crim. App. 2006) (footnotes & citations omitted).  We conclude the distinction between core work
product and other work product applies in criminal cases.  However, the scope of the defense’s request
was not limited solely to core work product. 
“[T]he work-product privilege does not operate as a blanket privilege
covering all decisions made by the DA’s Office.”  In re
Crudup, 179 S.W.3d 47, 50 (Tex. App.––San Antonio 2005, orig. proceeding), mand. granted on other grounds sub nom.,
In re Bexar County Crim. Dist. Attorney’s
Office, 224 S.W.3d 182, 188 (Tex. 2007). 
Any facts divulged to the assistant district attorney would be other
work product and would be discoverable upon a showing of substantial need and
the inability to obtain its substantial equivalent by other means without undue
hardship.

            C.        The Defense Failed to Establish a
Substantial Need 

            The State argues, even if the other
work product is not protected, that the defense failed to demonstrate a
substantial need to question the assistant district attorney.  The Texas Supreme Court has held a party must
show “‘substantial need’ for the testimony and the inability to obtain its
substantial equivalent by other means without ‘undue hardship.’”  Bexar
County Crim. Dist. Attorney’s Office, 224 S.W.3d at 188.  We believe that requirement is a reasonable
one and should apply to criminal cases as well as civil.  

            The
defense failed to establish a substantial need. 
While substantial need may have been demonstrated if the recordings
contained useful information,[38]
the recordings did not contain any useful information.  As such, there was no substantial need to question
the assistant district attorney.  We
overrule Brandon’s fourth point of error.

IV.       The Trial Court Did Not
Err in Admitting the Interrogation

            Prior
to Brandon’s arrest, Brandon and other family members were interrogated by Hunt
County sheriff’s deputies and Ranger Collins. 
These interrogations occurred approximately six days after Brandon’s
parents were found dead.  At Brandon’s
interrogation, two attorneys were present at the request of Brandon’s aunt.[39]  At least one attorney was present during the
entire interview.  Brandon argues the
circumstances of the interview establish that it was a custodial interview and
that his statements were involuntary because the attorneys told him he would be
arrested if he did not answer the investigators’ questions.

            Terry
Jones, a Hunt County investigator, testified Brandon arrived with his family in
their own vehicles.  Although Jones
admitted Brandon was suspected of committing the murders, Jones testified
Brandon was not given Miranda[40] warnings.  The interrogation began by Brandon complaining
about the investigators tearing up his dormitory room and about the way they
were conducting the investigation.  Early
in the interrogation, an unidentified speaker––presumably one of the
attorneys—stated:

                        UNIDENTIFIED
SPEAKER:  And maybe I better say what I
said to your sister a while ago, that we’ve been -- we’ve been asked to come
here as your temporary attorneys, and as such, we are bound by our -- by the
law and our professional ethics.  We can’t
repeat anything that’s said in here.  

 

            A.        [Brandon]  Okay. 
And I -- 

 

                        UNIDENTIFIED
SPEAKER:  Now, they -- they’re
investigators.  They can repeat it.  But -- so if there’s any question that you
don’t want to answer, of course, you have a right to remain silent.  But on the other hand, they have a right to
have you arrested and put you -- you know, charge you and this or -- 

 

            Q.        [Ranger Collins]  But you understand this -- you are not in
custody.

 

            A.        [Brandon]  Okay.

 

            Q.        [Ranger Collins]  This is not a custodial interrogation.

 

            .
. . . 

 

                        UNIDENTIFIED
SPEAKER:  . . . we’ll have to tell you,
you have a right not to answer.  On the
other hand, there are consequences of not answering, and we can’t -- we can’t
guarantee that -- that something won’t happen. 
And of course, their folks [sic], as to all officers, is to investigate
this matter -- 

 

            A.        [Brandon]  Right.

 

                        UNIDENTIFIED
SPEAKER: -- and -- 

 

            A.        [Brandon]  Exactly.

 

                        UNIDENTIFIED
SPEAKER: -- in an attempt to determine who perpetrated this crime -- these
crimes.  And the only way we can -- we
can proceed with you is you can answer what you want to answer, but it’s not as
though that’s the end of the story.

 

At multiple times during the
interview, the attorney also advised Brandon not to argue with the police officers.  

            Most
of the interrogation involved background information on Brandon, his parents,
and their friends.  The interrogators,
however, did ask Brandon about his whereabouts on the evening of his parents’
murders.  Near the end of the interview,
Brandon provided a saliva sample for DNA testing.  When Collins told Brandon that his version of
events did not comport with other evidence and accused Brandon of being
involved in the murders, Brandon denied his involvement and expressed his
aggravation that the police were “trying to look for an easy way out of this.”  Collins responded,

Well, let me ask you this, because we’ve been
called by a teacher from Rockwall, or told from a teacher in Rockwall that
after this happened, that the kids there in the class said, well, dang, if they’re
dead, Brandon did that.  Everybody knows
he hates his parents’ guts.

 

After this interchange, one of
the attorneys asked Brandon if he was ready to leave.  When Brandon asked if he could leave, Collins
responded, “[Y]ou’ve been free to go the whole time,” and Brandon left the
interrogation room.  Brandon was arrested
the following morning.  

            We
apply a bifurcated standard of review to a trial court’s denial of a motion to
suppress, giving great deference to the trial court’s determination of
historical facts and reviewing de novo the trial court’s application of the
law.  Maxwell
v. State, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002).  We give almost total deference to the trial
court’s determination of historical facts, especially when the trial court’s
fact findings are based on an evaluation of the credibility and demeanor of a
witness.  State v. Ross, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000); Guzman v. State, 955 S.W.2d 85, 89 (Tex.
Crim. App. 1977).  Mixed questions of law
and fact that do not turn on the credibility and demeanor of a witness are
reviewed de novo.  Ross, 32 S.W.3d at 856. This issue requires the court to make two
inquiries:  whether Miranda applies and whether the statements were voluntary.

A.        Miranda and Article 38.22 Do Not Apply
Because the Statement Was Not the Result of a Custodial Interrogation

 

            Brandon
argues the statement should have been suppressed because he was not given the
warnings required by Miranda, and Article 38.22, Section 5 of the
Texas Code of Criminal Procedure.  Article
38.22 of the Texas Code of Criminal Procedure and Miranda apply only to statements made as the result of custodial
interrogation.  See Tex. Code Crim. Proc.
Ann. art. 38.22, § 5 (Vernon 2005); Miranda,
384 U.S. 436.  Whether an interrogation
is custodial depends on whether, under the circumstances, a reasonable person
would believe his or her freedom of movement was restrained to the degree
associated with a formal arrest.  Dowthitt v. State, 931 S.W.2d 244, 254
(Tex. Crim. App. 1996); Rodgers v. State,
111 S.W.3d 236, 239–41 (Tex. App.––Texarkana 2003, no pet.).  In determining whether an interrogation is
custodial, we look to the objective circumstances, not to the subjective views
harbored by either the interrogating officer or the person being
questioned.  See Stansbury v. California, 511 U.S. 318, 323 (1994).  The subjective views of the interrogating
officer and the person being questioned are irrelevant unless they are manifested
in the words or actions of law enforcement officials.  See
Dowthitt, 931 S.W.2d at 254.  

            Brandon
argues a reasonable person in Brandon’s place would not have felt he was free
to leave.  The State directs our
attention to the fact that Brandon was informed multiple times that he was not
in custody and that Brandon terminated the interview.  After reviewing these facts, we find that the
circumstances of this interrogation would not cause a reasonable person to
conclude he or she was restrained to the degree associated with a formal
arrest.  Brandon was not restrained in
any way, and the officers denied Brandon was in custody.  While the officers may have had probable
cause to arrest Brandon, there is no indication Brandon was informed that the
officers had probable cause to arrest him. 
The interrogation was not custodial and, therefore, Miranda and Article 38.22 do not apply.

            B.        No Abuse of Discretion in Concluding the
Statement Was Voluntary

            Even
though Miranda does not apply, that
does not end our inquiry.  Due process,
under the Fourteenth Amendment, is violated if an involuntary statement is used
to establish guilt.  See Brown v. Mississippi,
297 U.S. 278 (1936); Carter v. State,
309 S.W.3d 31, 41 (Tex. Crim. App. 2010). 
Under the Fourteenth Amendment, a statement is involuntary only if it is
the result of official misconduct and the defendant’s will was overborne.  “[T]he factfinder must examine all of the
circumstances and the course of police conduct in evaluating the voluntariness
of those post-Miranda statements.”  Carter,
309 S.W.3d at 41.  Appellate courts “must
give great deference ‘to the trial judge’s decision to admit or exclude such
evidence, which will be overturned on appeal only where a flagrant abuse of
discretion is shown.’”  Id. at 42 (quoting Delao v. State, 235 S.W.3d 235, 238 (Tex. Crim. App. 2007)).  

                        1.         There Was No Official Misconduct 

            Under
the Fourteenth Amendment, the first step in our analysis is whether there was
official misconduct or coercion.  Colorado v. Connelly, 479 U.S. 157, 164
(1986).  In this case, there is no
evidence of misconduct by any governmental officials.  Brandon argues, however, that the governmental
officials sanctioned the coercive misconduct of private parties.  According to Brandon, the statements by his
private attorneys that he would be arrested if he did not provide a statement
were sanctioned by the interrogators.  

            Connelly concerned a defendant who heard
hallucinatory voices which demanded that he confess or kill himself.  Id.
at 161.  The United States Supreme Court
noted that the mental condition of the defendant is a factor in the “‘voluntariness’
calculus,” but cautioned “this fact does not justify a conclusion that a
defendant’s mental condition, by itself and apart from its relation to official
coercion, should ever dispose of the inquiry into constitutional ‘voluntariness.’”  Id.
at 164.  In distinguishing Blackburn v. Alabama, 361 U.S. 199
(1960) (defendant insane and police knew of mental problems), and Townsend v. Sain, 372 U.S. 293 (1963)
(defendant had been given drugs with truth-serum properties and police knew he
had been given drugs), the United States Supreme Court explained that the
police in those cases were aware of the condition and exploited that
condition.  

            There
is no evidence that the attorneys were acting in concert with the investigating
officers to obtain a statement.  In this
case, there is no evidence that the officers knew Brandon interpreted the
attorneys’ statements to mean he would be arrested if he did not give a
statement.  The attorneys did not
specifically state Brandon would be arrested if he failed to give a
statement.  Such an interpretation must
be inferred from the statements. 
Although the statements might be misinterpreted, there is no evidence
the officers were aware of this misinterpretation and exploited or sanctioned
it.  The trial court did not abuse its
discretion in rejecting the argument that the law enforcement officers sanctioned
the statements.  

                        2.         Brandon’s Will Was Not Overborne 

            Even
if there was official misconduct, Brandon has failed to show his statement was
not voluntary.  Once official misconduct
has occurred, the next question under the Fourteenth Amendment is whether the
defendant’s confession or admissions were voluntary.  A statement is involuntary if the totality of
the circumstances surrounding its acquisition shows that the defendant’s will
was “overborne” by police coercion.  Creager v. State, 952 S.W.2d 852, 856 (Tex.
Crim. App. 1997).  “A statement is ‘involuntary,’
for the purposes of federal due process, only if there was official, coercive
conduct of such a nature that any statement obtained thereby was unlikely to
have been the product of an essentially free and unconstrained choice by its
maker.”  Alvarado v. State, 912 S.W.2d 199, 211 (Tex. Crim. App. 1995); Reed v. State, 59 S.W.3d 278, 281 (Tex.
App.––Fort Worth 2001, pet. ref’d).  A
defendant’s age is a relevant factor in the voluntariness analysis.  Diaz v.
State, 61 S.W.3d 525, 529 (Tex. App.––San Antonio 2001, no pet.)
(considering fifteen-year-old defendant’s age in concluding statement was
involuntary).  

            The
ultimate question is whether the suspect’s will was overborne.  Id.;
Lugo v. State, 299 S.W.3d 445, 451
(Tex. App.––Fort Worth 2009, pet. ref’d). 
Brandon was a nineteen-year-old college student and did not appear to be
unduly intimidated during the interview. 
In fact, Brandon argued with the investigators on a number of
occasions.  It is clear that Brandon’s
will was not overborne.  Brandon made no
confession or incriminating statements during the interview, but merely denied
everything.  The trial court did not
abuse its discretion in concluding that the statements were voluntary.  

V.        Conclusion

            The
evidence was sufficient under Jackson v.
Virginia.  The trial court did not
err in denying the motion to dismiss because the State failed to obtain any
useful information by recording and reviewing Brandon’s privileged
attorney-client telephone calls.  The
remedy ultimately fashioned by the trial court—ordering all evidence obtained
as a result of the recording suppressed—was sufficient to identify and purge
the taint.  The effectiveness of this
remedy was further enhanced when the Hunt County District Attorney’s Office
recused from the case and the file was reviewed before being transferred to the
Texas Attorney General’s Office.  Judge Biard
did not err in refusing to permit questioning of the assistant district attorney
who reviewed the recordings because the defense failed to establish substantial
need.  Finally, the trial court did not
err in denying the motion to suppress.  

            For the reasons stated, we affirm.

 

 

                                                                        Jack
Carter

                                                                        Justice

 

Date Submitted:          October 6, 2010

Date Decided:             December 3, 2010

 

Publish











[1]With
Judge Cochran joining the lead opinion, authoring a concurring opinion and
Judge Womack concurring with the lead opinion and joining the concurrence, in Brooks v. State, No. PD-0210-09, 2010 WL
3894613, at **1, 14 (Tex. Crim. App. Oct. 6, 2010) (4-1-4 decision), a
plurality of the Texas Court of Criminal Appeals abolished the factual
sufficiency review established by Clewis
v. State, 922 S.W.2d 126 (Tex.
Crim. App. 1996), and its
progeny.  The plurality and Judge Womack
agreed that the Jackson v. Virginia
legal sufficiency standard is the only standard that a reviewing court should
apply in determining whether the evidence is sufficient to support each element
of a criminal offense that the State is required to prove beyond a reasonable
doubt.  Brooks, 2010 WL 3894613, at **1, 14.  Since the Texas Court of Criminal Appeals has
abolished factual sufficiency review, we need not address the defendant’s
challenge(s) to the factual sufficiency of the evidence.

 





[2]Clewis, 922 S.W.2d 126.





[3]Cell
phone records verified this call was made from a cell tower in Magnolia,
Arkansas.





[4]At
the time of the murders, Brandon had dark hair. 
Brandon’s natural hair color, though, was blond.  

 





[5]Four
of the gunshot wounds occurred to the face and neck.  One of the gunshot wounds entered through the
back of Norma’s hand.  Dr. Spotswood
opined that the wound probably occurred when Norma covered her face with her
hand.  





[6]Eric
Gentry, Brandon’s roommate, testified his mother had informed Brandon the
dagger probably violated ACU’s rules and admitted Brandon could have taken the
dagger home.  

 





[7]At
the time of the murders, Norma and Dennis were in the process of moving from
their prior residence in Heath, Texas, to a manufactured home in Royse City,
Texas.  The move was intended to decrease
expenses.  Many items belonging to Norma
and Dennis were still at the Heath house.





[8]The
State argues Brandon called Martinez in an attempt to get their stories
straight.  Martinez testified Brandon
suggested he should remember that they met up at 9:30 p.m.  On cross, Martinez admitted he did not know
what time they met and had conferred with his girlfriend about the time.  Martinez admitted he had claimed they had met
at 9:30 p.m. for three and a half years. 


 





[9]Tamera
Keel testified, though, that Brandon would frequently not wear a shirt or shoes
when riding horses and that she was “always constantly telling him to put his
shirt on.”  

 





[10]The
State argued Brandon may have had evidence of the murder in the bag.  After he heard of his parents’ deaths,
Brandon asked to borrow his roommate’s bag. 
Eric Gentry, Brandon’s roommate, testified he does not remember Brandon
ever asking to borrow a bag prior to the murders.  Brandon’s suitcase was seized by the police.  Ranger Jeffery Collins testified the tests on
the suitcase for blood and gunshot residue were negative. 

 





[11]In
a news interview introduced into evidence, Brandon states that he left the
Royse City house around 7:30 p.m., at the latest, that he left the Royse City
house before dark, and that he went to the Heath house to feed their animals,
including two dogs, two cats, and a bird, and estimated it would take him
between thirty and forty-five minutes to feed the animals.  





[12]In
the news interview, Brandon claimed he had permission to drive Norma’s truck
and claimed he “normally drives the truck.” 


 





[13]As
pointed out by the defense, the Royse City house had more land and, therefore,
the amount of land could explain this lie.

 





[14]In
addition to being less expensive, the Royse City manufactured home also had
more land to allow Norma to stop boarding her horses. 





[15]Hoffman
testified Charla collapsed at J.C. Penney and Brandon did not act concerned and
asked her to finish his hair.  Charla,
however, testified she did not collapse at the mall.  Further, Hoffman admitted that she had
already made up her mind that Brandon was guilty.  

 





[16]Charla,
Brandon’s older sister, testified her parents had given her a credit card to
use for gas.  





[17]Brandon
had driven Morgan to Waco the day before the murders and helped her purchase a
lamb.  After returning, Brandon and
Morgan both took showers at Morgan’s house. 
Brandon took a shower upstairs next to the room where the gun was kept,
and Morgan took a shower downstairs.  

 





[18]Most
factory bullets are produced by lead wire instead of being cast.  Clow testified, though, that you can purchase
cast lead bullets.  





[19]Randy
Lunz, a neighbor at the Heath house, testified he saw Brandon at the Heath
house after 10:00 on the night of the murders. 
Lunz testified he heard a vehicle arrive at the Heath house just before
he went to sleep.  Lunz stated he had
taken his dogs out right after the news came on around 10:00, gone to bed, and
it takes him about fifteen to twenty minutes to get to sleep.  Lunz testified, once he saw it was Brandon,
he went back to bed.  Lunz testified he
thought Brandon had on a white T-shirt and blue jeans, but admitted Brandon
could have been shirtless.  Lunz
testified it takes ten to fifteen minutes maximum to take his dogs out and
maybe fifteen minutes maximum to get ready for bed.  When asked on redirect, “is it fair to say it’s
definitely at least 15, 20 minutes after 10 o’clock before you actually made it
to bed,” Lunz responded in the affirmative. 
Thus, the latest time would be 10:45 p.m. and the earliest time would be
10:15 p.m.  

 





[20]Jerry
LaBerteaux, an employee of AT&T called by the State, testified the murders
occurred during a period of time when AT&T and Cingular were merging.  During this time, Cingular customers could
use AT&T towers, but the calls would not appear on their bills.  The police obtained and preserved Brandon’s
Cingular records, but did not request records from AT&T.  Because the records are normally only
retained for six to nine months, the records from AT&T could not be
obtained.  Therefore, complete data for
Brandon’s cell phone calls were only available for four of the more than twenty
calls Brandon received between seven and eleven the night of the murders.  The earliest of these four calls was around
10:45 p.m. and indicates that Brandon was driving into Dallas at the time.  

 





[21]The
Attorney General’s Office investigator admitted the exact traffic conditions
could not be replicated.  

 





[22]This
call was the one Brandon made to Morgan’s cell phone.





[23]Brandon’s
father did not often participate in FFA and 4-H activities.  Witnesses speculated that Dennis probably did
not participate either because he was extremely overweight or because he was
more of a computer-type person.

 





[24]Charla
testified Brandon had not done well academically in high school.  

 





[25]Deann
Glover, who worked with Brandon at Chism Feed, testified Brandon was excited
about the move because Dennis and Norma would have more land for his
animals.  

 





[26]Based
on the October 2005 billing cycle. 





[27]Norma
had hairs in her right hand.  Although
the police speculated the hairs may have been from her assailant, the hairs
were not tested.   





[28]In
Brooks, the Texas Court of Criminal
Appeals gave an example.  A witness
testifies that robber A robbed the store when the video recording of the event
undisputedly showed robber B committed the offense.  Even though it was the prerogative of the
jury to believe the witness that A was the offender, a review of all the
evidence would show the jury’s finding is not a rational finding.  Brooks,
2010 WL 3894613, at *11.





[29]Unless
specified otherwise, this memorandum will refer to The Honorable Richard A.
Beacom as the trial court.

 





[30]We
are not suggesting that any restriction of the right to communicate with
counsel or any monitoring of telephone calls constitutes a constitutional
violation.  “Not every restriction on
counsel’s time or opportunity to investigate or to consult with his client or
otherwise to prepare for trial violates a defendant’s Sixth Amendment right to
counsel.”  Morris v. Slappy, 461 U.S. 1, 11 (1983); see Cacicio v. Secretary of Pub. Safety, 665 N.E.2d 85, 92 (Mass.
1996) (monitoring of other telephone calls did not violate the Sixth Amendment
when attorney-client telephone calls were not monitored); State v. Hancock, 840 N.E.2d 1032, 1051 (Ohio 2006) (inability to
visit client “on the spur of the moment” not constitutional violation).





[31]In
a footnote, the United States Supreme Court suggested an exception to this rule
may exist when there is a pattern of recurring violations.  Morrison,
449 U.S. at 365 n.2.  The Court stated “the record before us
does not reveal a pattern of recurring violations by investigative officers
that might warrant the imposition of a more extreme remedy in order to deter
further lawlessness.”  Id. 
This case does not demonstrate a pattern of recurring violations. 





[32]Although
the record suggests the telephone calls were transcribed, no transcriptions of
the calls have been provided to this Court on appeal.  On appeal, the record contains thirty-four
CDs, each containing multiple recorded telephone calls.  





[33]However,
the existence of forty-three pages of notes does not imply the notes contain
any useful information.

 





[34]At
a later hearing, the defense presented evidence before Webb Biard, Senior Judge
of the 6th Judicial District Court, that the tapes had been played to at least
two fact witnesses.  Both witnesses
testified the tapes did not have any influence on their testimony.  This evidence, though, was not before Judge
Beacom when he denied the defense’s motion to dismiss.





[35]After
finding the Sixth Amendment violation, the trial court properly followed the
United States Supreme Court directive to “identify and then neutralize the
taint by tailoring relief appropriate in the circumstances to assure the
defendant effective assistance of counsel and a fair trial.”  Morrison, 449 U.S. at 365. 





[36]The
defense does not challenge the denial of this motion.  The defense limits its challenge to the
denial of the opportunity to question the assistant district attorney.  





[37]Cameron, 241 S.W.3d at 19.





[38]Under
this hypothetical, the defense might have a substantial need to question the
prosecutor to establish prejudice.

 





[39]Linda
Matthews, Brandon’s aunt, testified at trial the investigators had informed her
that family members could not be present during the interview.  Matthews testified she “didn’t want [Brandon
and his sister] in there by themselves” because “[t]hey had just lost their
parents.  They were young.”  Matthews, who was a legal assistant in
Texarkana, asked her boss for help finding an attorney.  Her boss, who was a civil attorney, but had
done criminal work earlier in his career, and her boss’ son, who was an
attorney with more recent criminal experience, were present during the
interview.  The record does not contain
any more detailed information concerning these attorneys. 

 





[40]Miranda v. Arizona, 384 U.S. 436 (1966).